ROB BONTA
Attorney General of California
LARA HADDAD
R. MATTHEW WISE
Supervising Deputy Attorneys General
NANDING CHEN (SBN 348808)
JOE MEEKER (SBN 336725)
S. CLINTON WOODS (SBN 246054)
CAROLYN DOWNS (SBN 353455)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6720
Fax: (916) 731-2124
E-mail: Carolyn.Downs@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES NATIONAL ARCHIVES AND RECORDS ADMINISTRATION; BRADFORD WILSON,** in his official capacity as Archivist of the United States,<br><br>Defendants. | Case No. 5:26-cv-11868-NW<br><br>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION OR STAY**<br><br>Date: February 17, 2027<br>Time: 9:00 a.m.<br>Dept: 3<br>Judge: The Honorable Nöel Wise<br>Trial Date: None set.<br>Action Filed: October 14, 2026 |

## TABLE OF CONTENTS

Page

INTRODUCTION ........ 1
BACKGROUND ........ 2
I. The National Archives at San Francisco ........ 2
II. Closure of the National Archives at San Francisco ........ 5
ARGUMENT ........ 8
I. California Is Likely to Succeed on Its Claim that Closure of the National Archives at San Francisco and Transfer of Records Violates the Administrative Procedure Act ........ 8
A. Plaintiff Has Standing to Challenge the Closure and Transfer of Records ........ 8
B. Closure of the National Archives at San Francisco and Transfer of Its Records Is Arbitrary and Capricious ........ 11
1. Closure and transfer of records are final agency actions ........ 12
2. Defendants likely acted arbitrarily and capriciously by failing to consider the public's interest in access to National Archives records ........ 13
3. Defendants' failure to consider legitimate reliance interests is also arbitrary and capricious ........ 16
C. California Will Suffer Irreparable Harm Absent a Preliminary Injunction ........ 18
1. The only way to access most of the records is in person ........ 19
2. The closure will irreparably harm the work of State agencies ........ 20
3. The closure will irreparably harm California's faculty and students ........ 21
4. The closure would irreparably harm California's people ........ 23
D. The Balance of Harms and Public Interest Support an Injunction ........ 24
CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*All. for the Wild Rockies v. Pena*
865 F.3d 1211 (9th Cir. 2017) .......... 8

*Allied Loc. & Reg'l Mfrs. Caucus v. EPA*
215 F.3d 61 (D.C. Cir. 2000) .......... 11

*Am. Friends Serv. Comm. v. Webster*
720 F.2d 29 (D.C. Cir. 1983) .......... 10, 11

*Ariz. Mining Reform Coal. v. United States Forest Serv.*
172 F.4th 641 (9th Cir. 2026) .......... 11

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*
397 U.S. 150 (1970) .......... 10

*Bennett v. Spear*
520 U.S. 154 (1997) .......... 12

*California v. Azar*
911 F.3d 558 (9th Cir. 2018) .......... 9

*California v. Health & Hum. Servs.*
281 F. Supp. 3d. 806 (N.D. Cal. 2017) .......... 8

*California v. Trump*
963 F.3d 926 (9th Cir. 2020) .......... 10, 11

*Clarke v. Sec. Indus. Ass'n*
479 U.S. 388 (1987) .......... 10

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*
591 U.S. 1 (2020) .......... 17, 18

*Doe #1 v. Trump*
957 F.3d 1050 (9th Cir. 2020) .......... 18

*E. Bay Sanctuary Covenant v. Biden*
993 F.3d 640 (9th Cir. 2021) .......... 24

*Ecology Ctr., Inc. v. U.S. Forest Serv.*
192 F.3d 922 (9th Cir. 1999) .......... 12

*Encino Motorcars, LLC v. Navarro*
579 U.S. 211 (2016) .......... 17

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*FDA v. Wages & White Lion Invs., LLC*
604 U.S. 542 (2025) ........ 17

*Harrison v. PPG Indus., Inc.*
446 U.S. 578 (1980) ........ 12

*Havens Realty Corp. v. Coleman*
455 U.S. 363 (1982) ........ 9

*Immigr. Defs. L. Ctr. v. Noem*
145 F.4th 972 (9th Cir. 2025) ........ 8, 18

*Ipsen Biopharmaceuticals, Inc. v. Azar*
943 F.3d 953 (D.C. Cir. 2019) ........ 12

*Judulang v. Holder*
565 U.S. 42 (2011) ........ 13

*Korematsu v. United States*
323 U.S. 214 (1944) ........ 19

*League of Women Voters of U.S. v. Newby*
838 F.3d 1 (D.C. Cir. 2016) ........ 24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*
572 U.S. 118 (2014) ........ 10

*Lujan v. Defs. of Wildlife*
504 U.S. 555 (1992) ........ 8

*Magassa v. Mayorkas*
52 F.4th 1156 (9th Cir. 2022) ........ 12

*Michigan v. EPA*
576 U.S. 743 (2015) ........ 13

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983) ........ 11, 16

*Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*
522 U.S. 479 (1998) ........ 10

*New York v. Kennedy*
155 F.4th 67 (1st Cir. 2025) ........ 13

## TABLE OF AUTHORITIES
**(continued)**

**Page**


*Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*
181 F.4th 961 (9th Cir. 2026) .... 16

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*
477 F.3d 668 (9th Cir. 2007) .... 16

*Ohio v. EPA*
603 U.S. 279 (2024) .... 11

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*
465 F.3d 977 (9th Cir. 2006) .... 12, 13

*Pacito v. Trump*
169 F.4th 895 (9th Cir. 2026) .... 17

*Ramirez v. U.S. Immigr. & Customs Enf't*
471 F. Supp. 3d 88 (D.D.C. 2020) .... 16

*SEC v. Chenery Corp.*
318 U.S. 80 (1943) .... 15

*TikTok Inc. v. Trump*
490 F. Supp. 3d 73 (D.D.C. 2020) .... 25

*Tohono O'odham Nation v. Dep't of the Interior*
138 F.4th 1189 (9th Cir. 2025) .... 12

*U.S. Army Corps. of Eng'rs v. Hawkes Co.*
578 U.S. 590 (2016) .... 12

*United States. v. Wong Kim Ark*
169 U.S. 649 (1898) .... 3, 19

*Utah v. Evans*
536 U.S. 452 (2002) .... 9

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) .... 8

**Statutes**

United States Code, Title 5
§ 705 .... 8, 18, 25
§ 706 .... 8
§ 706(2)(A) .... 11

## TABLE OF AUTHORITIES
**(continued)**

**Page**

United States Code, Title 44
§ 2104(d) .......... 13
§ 2107(a)(1) .......... 14
§ 2107(a)(2) .......... 14
§ 2107(a)(3) .......... 14
§ 2109 .......... 14
§ 2114 .......... 14
§ 2203(g)(1) .......... 14
§ 2910 .......... 14

National Archives and Records Administration Act of 1984, Pub. L. No. 98-497, 98 Stat. 2280 (1984) .......... 10, 14

**OTHER AUTHORITIES**

https://www.archives.gov/about/history (last visited Oct. 28, 2026) .......... 10

https://www.archives.gov/about/history/about/history/history-and-mission (last visited Oct. 28, 2026) .......... 13

https://www.archives.gov/research/immigration/aliens (last visited Oct. 28, 2026) .......... 2

https://www.archives.gov/research/news (last visited Oct. 28, 2026) .......... 18

S. Rep. No. 98-373 (1984) .......... 14, 15

## INTRODUCTION

The mission of the National Archives and Records Administration ("NARA") is to "preserve, protect, and share the historical records of the United States to promote public inquiry and strengthen democratic participation." Numerous statutory provisions governing Defendants' (NARA and Archivist Bradford Wilson) exercise of their duties recognize the public's interest in National Archives materials and the importance of public access to them. Yet, in June 2026, in direct contradiction to its mission and without any meaningful explanation, NARA announced that it would be closing the National Archives at San Francisco "in the next few years" and would begin transferring its vast collection of records out of the facility to other National Archives facilities in the following months. NARA made this announcement without consulting with Plaintiff State of California, its state agencies and university researchers, tribes, or community stakeholders who rely on archived materials to study the history of the region, trace their heritage, establish tribal membership, and make informed policy decisions. Consistent with this lack of public participation, any public justification for NARA's decision has been cursory at best. Nevertheless, since its announcement, NARA has already begun moving documents out of the National Archives at San Francisco. And just this week, NARA informed Plaintiff that it would no longer honor the parties' prior agreement to refrain from moving permanent records pending the outcome of this litigation (an agreement that Plaintiff had relied upon in refraining from filing this motion); NARA made clear that it will not delay the transfer of permanent records beyond February 28, 2027. Absent injunctive relief, nothing prevents them from doing so sooner.

Because Defendants have an obligation under federal law to consider the public interest in making determinations about National Archives facility closures and records transfers and to make a reasoned decision in accordance with those considerations, NARA's abrupt decision to close the National Archives at San Francisco is arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). And as the accompanying declarations show, scattering these records across the country, as Defendants have already begun to do, will have profoundly harmful, irreversible consequences to the agencies who need access to these records for mission-critical work, for scholars who depend on them for important research, and for the people whose

history is contained in these records. To prevent Defendants from taking further action, the Court should issue a preliminary injunction or alternatively, a stay pursuant to the APA.

## BACKGROUND

### I. The National Archives at San Francisco

The National Archives at San Francisco, located in San Bruno, California, has been open since 1973. The over 200,000 square foot building is occupied by NARA and owned by the General Services Administration ("GSA"). The San Bruno facility holds over 75,000 cubic feet of records from federal agencies dating back to the 1850s, when California became a state. Compl. ¶ 23, ECF No. 1. These collections of records contain the history of not only Northern and Central California, but also Hawaii, Guam, American Samoa, and most of Nevada, as well as the Navy bases in the Pacific and the former Trust Territory of the Pacific Islands. *Id.* The San Bruno facility is one of the National Archives' 27 research facilities, offering eight research desks that allow members of the public to examine records firsthand. *Id.*

The San Bruno facility's holdings are vast and intensely relevant to the history of the regions and communities they cover. Included in its holdings are records with special significance to the Japanese and Chinese American communities, such as court and case records of Japanese American internment during World War II, Compl. ¶¶ 25–26; Ina Decl. ¶ 5; Hayashi Decl. ¶ 5; van Harmelen Decl. ¶ 9; Yang Decl. ¶ 7, and immigration files from the Angel Island Immigration Center, Compl. ¶ 26; Lau Decl. ¶¶ 5–6; Leong Decl. ¶ 4; Sueyoshi Decl. ¶ 3; van Harmelen Decl. ¶ 8; Yang Decl. ¶ 6. The San Bruno facility also has more than 300,000 Alien Files for persons born before 1925, which NARA previously agreed to keep at the San Bruno facility "[b]ecause of strong interest and advocacy . . . by local research communities and their congressional representatives."[1] The facility also houses records of American naval activity in World War II in the Pacific Islands, and Pacific Islander enlistment records from the United States Army and Navy. Compl. ¶ 28; Camacho Decl. ¶ 7; Yang Decl. ¶ 8.

In addition, the National Archives at San Francisco is a repository for federal court records in the region, including records from the Ninth Circuit Court of Appeal. Among the holdings are

[1] https://www.archives.gov/research/immigration/aliens (last visited Oct. 28, 2026).

court records of Wong Kim Ark, whose United States Supreme Court case *United States v. Wong Kim Ark* established birthright citizenship. van Harmelen Decl. ¶ 9. The San Bruno facility is also home to the court records of Fred T. Korematsu, who was arrested and convicted for refusing to report to a Japanese internment camp during World War II, and appealed his conviction all the way to the United States Supreme Court. Compl. ¶ 25; Korematsu Decl. ¶¶ 17, 22. His daughter, Karen Korematsu, founded the Korematsu Institute to continue her father's legacy and preserve his story. Korematsu Decl. ¶ 3. The San Bruno facility houses important documents crucial to Karen Korematsu's ongoing research into his arrest, prosecution, and legal challenges. *Id.* ¶ 17.

Records at the National Archives at San Francisco allow Asian American families to better connect with their history. For example, Dr. Satsuki Ina, Professor Emeritus at California State University, Sacramento, has depended on the records at the San Bruno facility to piece together her family history—from her grandparents' arrival in the United States in the 1880s, to her own birth in the Tule Lake Segregation Center, where she was labeled by the United States government as an "alien enemy" at just four months old. Ina Decl. ¶¶ 5–7. Without visits to the San Bruno facility, she would have been unable to find details of her parents' imprisonment in Japanese internment camps around the country, "from the location of the camps to the type of shoes they wore." *Id.* ¶ 6. The experience of holding the records of her family's internment helped her process the historical trauma that her family and their community suffered. *Id.* ¶ 8.

The National Archives at San Francisco also holds a significant number of tribal records from tribes throughout Northern and Central California. Compl. ¶ 27. These records include individual student files for Indian Boarding Schools and documents relating to the Indian Judgment Rolls, a historical list created by the Bureau of Indian Affairs to identify individuals eligible to receive settlements from lawsuits against the federal government. Keliiaa Decl. ¶ 5. Also included in its holdings are documents relating to tribal enrollment, censuses, Indian trust funds, and land holdings, such as maps, photographs, court records, and genealogies. Compl. ¶ 27. Records housed at the San Bruno facility are necessary to restore tribes' federal recognition and for individuals to establish tribal membership. *See* Sworn Decl. of Jay Petersen ¶¶ 10, 15, Compl. for Declaratory and Injunctive Relief, *Cal. Indian Legal Servs. v. Nat'l Archives &*

*Records Admin.*, No. 3:26-cv-12310 (N.D. Cal., Oct. 21, 2026) ("CILS Compl.").

Aside from use by local community members and tribes, the National Archives at San Francisco provides invaluable source materials for important academic research at California universities. *See, e.g.*, Magruder Decl. ¶¶ 6–8; Camacho Decl. ¶ 5; Hirota Decl. ¶¶ 3–8; Kawano Decl. ¶¶ 4–6; Lau Decl. ¶¶ 4–5; Leong Decl. ¶ 5; Sueyoshi Decl. ¶ 3; Yang Decl. ¶¶ 6–7; Keliiaa ¶ 7. Because many of these records are not digitized, faculty and students must physically visit the San Bruno facility to conduct their research, often making several visits over the course of a research project. *See, e.g.*, Sueyoshi Decl. ¶¶ 4–5. For example, University of California (UC), Berkeley Professor Hidetaka Hirota has used records at the San Bruno facility to conduct intensive research on the history of federal immigration restrictions on foreign workers. Hirota Decl. ¶ 5. Researching physical Immigration and Naturalization Service case files of persons who immigrated through San Francisco and Honolulu allowed Professor Hirota to gain unique insight into the mindset of federal immigration officials and get a more accurate picture of how federal immigration policy functioned at the time. *Id.* ¶¶ 5, 7. Professor Hirota plans to visit the San Bruno facility frequently over the coming months to dig into those materials and complete his project. *Id.* ¶ 8. In fact, at the time he gave his Declaration, Professor Hirota had an appointment scheduled at the San Bruno facility the following week. *Id.*

In addition, California state agencies often rely on the records at the San Bruno facility to conduct research for state programs. For example, the California Department of Transportation ("Caltrans") is required by state and federal law to assess the environmental impacts of certain projects. Price Decl. ¶¶ 2–3. As part of this research-intensive process, Caltrans could reasonably need to determine the historical context and significance of the built environment that may be impacted. *Id.* ¶ 3. The San Bruno facility contains many records pertinent to this inquiry, such as records from the Federal Highway Administration and the Civilian Conservation Corps. *Id.* ¶ 4.

Many documents housed at the San Bruno facility are original documents that cannot be found elsewhere, including online, as a vast majority of the records are not digitized or cannot be digitized. Thus, researchers often must make in-person visits to examine records. *See* Magruder Decl. ¶ 6; Camacho Decl. ¶¶ 4, 7, 10; Dewey Decl. ¶ 4; Hayashi Decl. ¶ 4; Hirota Decl. ¶ 9; Lau

Decl. ¶¶ 6–7; Leong Decl. ¶¶ 5–6; Kawano Decl. ¶ 5; Price Decl. ¶ 4; Sueyoshi Decl. ¶¶ 3, 4; van Harmelen Decl. ¶¶ 12–13; Yang Decl. ¶ 11. Some records are too fragile to be digitized. For example, many records of American naval activity in World War II have suffered damage from exposure to humid climates in the Pacific, and digitizing them risks further damage or even destruction. *See* Camacho Decl. ¶ 7. For these and other fragile documents, there is also significant risk that they will be damaged or destroyed in transit. *See* van Harmelen Decl. ¶ 11. If damaged or destroyed, these records will be lost to history forever.

Despite NARA's recent attempts to digitize its holdings, the overwhelming volume of records housed at the San Bruno facility make it virtually impossible to digitize them anytime soon. *See* Camacho Decl. ¶ 7; Keliiaa Decl. ¶ 9; Lau Decl. ¶ 8; Leong Decl. ¶ 6; van Harmelen Decl. ¶ 12. Across all of NARA's facilities, only 3.87 percent of its approximately 13.5 billion pages of textual records have been digitized, meaning more than 12 billion pages of records are only accessible physically. Compl. ¶¶ 21–22. A recent Inspector General report found that NARA is unable to even ingest the large data sets of electronic records generated by federal agencies that are transmitted to NARA, as it is mandated to do. *Id.* ¶ 31. Without the ability to upload and handle these files, "NARA's capacity to respond to records requests effectively and efficiently is significantly reduced." *Id.* If NARA is unable to handle records already in electronic format, it is difficult to imagine that it can handle digitizing and making publicly available the more than 12 billion records awaiting digitization.

## II. Closure of the National Archives at San Francisco

Per news reporting, the National Archives Chief Operating Officer ("COO") Jay Trainer emailed employees at the National Archives at San Francisco in June 2026 stating that NARA plans to close the San Bruno facility, along with the National Archives at Chicago, in the next few years. Compl. ¶ 34. Shortly after the email was sent, NARA announced the closure on its website. *Id.* NARA did not make any effort to consult the public before reaching this decision, and neither the email nor the announcement on NARA's website explained where the records would be moved or included a more specific timeframe for the closure. *Id.* According to reporting, the COO's email to staff—which has not yet been made public—asserted several purported reasons

for the closure, including to reduce costs, "reduce estate portfolio," and support the "long-term financial health and viability of the Federal Records Center Program's revolving fund." *Id.* ¶ 35. NARA still has not announced a more certain date for closure; the National Archives at San Francisco website merely states that the facility will be "closing in the next few years." *Id.* ¶ 37. The uncertainty is already harming stakeholders: following the announcement, appointments for San Bruno's eight research desks have been booked out months in advance as people scramble to view and photocopy relevant records before they lose access. *See* Lau Decl. ¶ 8; Yang Decl. ¶ 12.

Shortly after the closure was announced, the public and lawmakers expressed grave concern about the sudden decision to close the facility and move records out of Northern California. United States Representatives Kevin Mullin and Judy Chu sent a bipartisan, bicameral letter from 37 lawmakers requesting explanation for the closure and urging NARA to reconsider. Compl. ¶ 38; Downs Decl. Ex. A. In response to that letter, NARA COO Jay Trainer attempted to justify the closure as part of a larger downsizing effort "necessary in order for NARA to maintain its core mission." Downs Decl. Ex. B. Trainer contended that with the increase in digital records coming into NARA facilities, there is less need for physical storage space. *Id.* Trainer also stated that NARA expects to save $4.7 million annually by closing the San Bruno facility, and to avoid future costs for repairs and personnel. *Id.* The letter does not disclose the costs NARA will incur to close the San Bruno facility and to relocate the facility's records, nor does it list any estimated timeframe for when those records will once again become available to the public. *Id.*

In an August 2026 update to its website, NARA announced that all records from the San Bruno facility will be relocated to five other NARA locations across the country: National Archives at Riverside, National Archives at Denver, National Archives at College Park, National Archives at Fort Worth, and National Archives at Kansas City. Compl. ¶ 41. Thus, after the closure of the San Bruno facility, the closest facility where the records can be physically accessed will be a seven-and-a-half hour drive away, with most records being strewn further across the country, as far as College Park, Maryland. In NARA's next update in September 2026, it announced the relocation of the first set of records from the San Bruno facility, specifically the transfer of all records from the National Aeronautics and Space Administration ("NASA") to the

National Archives at Fort Worth on October 13, 2026. *Id.* ¶ 42.

There are other signs that NARA will move quickly to relocate records from the San Bruno facility to other National Archives facilities. On September 28, 2026, NARA awarded $8.8 million—with an anticipated award of up to $25 million—to Iron Mountain Information Management LLC for "services to coordinate and provide staff and transportation services to perform shelf-to-shelf transfer of federal records between various NARA facilities." Compl. ¶ 44. And as noted above, relocation does not mean that the records will be available anytime soon. California university professors stand to incur serious harm to their ongoing and future research projects due to lack of access. *Infra* Argument.I.C.3. The pace of the records relocation process exacerbates concern that records—including fragile and delicate documents and artifacts—will be mishandled, damaged, lost, or incorrectly processed during transfer. *See* Camacho Decl. ¶ 10; Hayashi Decl. ¶ 8; Keliiaa Decl. ¶ 9; Leong Decl. ¶ 10.[2] This comes after a 2024 audit report found that NARA had not complied with its own records relocation requirements, resulting in "insufficient validation and confirmation of actual quantities of records moved," as well as the failure to "ensur[e] that records were shelved in the correct spaces, in proper order, or without loss or damage." Compl. ¶ 44. Undigitized records (which make up essentially all records) thus face a serious risk of loss or permanent damage during transfer, which could cause irreparable harm to the California agencies, researchers, and citizens who need them.

NARA's actions in response to this litigation strongly suggest that relocation is imminent. On November 3, 2026, after a week of negotiation, NARA's counsel represented that NARA would "not relocate any archival records from the San Bruno facility at this time and will wait until the resolution of this lawsuit" if Plaintiff refrained from seeking a preliminary injunction. Downs Decl. Ex. C. Plaintiff justifiably relied upon NARA's representation. Yet, on November 9, NARA reversed course, stating that it would not delay transfer of the records beyond February 28, 2027, and that it intends to proceed with "executing the transfer." *Id.* This motion follows.

[2] In its rush to shutter the facility, NARA did not inform or consult with tribes or tribal leaders before announcing the closure. Compl. ¶ 40; *see* Sworn Decl. of Dean Tonenna ¶ 14, CILS Compl. Only after it had already determined where the records would be transferred did NARA hold two virtual "tribal listening sessions" open to tribal nations with interest in the National Archives at San Francisco and National Archives at Chicago. Compl. ¶ 43.

## ARGUMENT

### I. California Is Likely to Succeed on Its Claim that Closure of the National Archives at San Francisco and Transfer of Records Violates the Administrative Procedure Act

In addition to vacatur under 5 U.S.C. § 706, the APA authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "[T]he factors considered in determining whether to postpone agency action pursuant to § 705 'substantially overlap with'" the preliminary injunction factors. *Immigr. Defs. L. Ctr. v. Noem*, 145 F.4th 972, 986 (9th Cir. 2025), overruled on other grounds by *Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622 (9th Cir. 2026). Thus, the moving party must show that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the "sliding scale" test for a preliminary injunction, a court may grant a preliminary injunction upon a showing that there are "serious questions" going to the merits—a lesser showing than likelihood of success on the merits—"if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (emphasis original).

#### A. Plaintiff Has Standing to Challenge the Closure and Transfer of Records

California has constitutional and statutory standing to challenge Defendants' decision to close the National Archives at San Francisco and transfer its records out of Northern California.

To begin with, California meets each of the requirements to establish constitutional standing to challenge the closure and transfer of records: California will suffer an injury in fact that is concrete and particularized, "fairly traceable" to the Defendants' conduct, and "likely to be redressed by a favorable judicial decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "Agency action that causes a state to 'incur significant costs' is sufficient to constitute injury in fact." *California v. Health & Hum. Servs.*, 281 F. Supp. 3d. 806, 821–22 (N.D. Cal. 2017) (quoting *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015)), *aff'd in part, vacated in part,*

*remanded sub nom. California v. Azar*, 911 F.3d 558 (9th Cir. 2018). So, too, is agency action that interferes with a state's ability to provide effective services. *Cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (organization suffers injury in fact where a statute "perceptibly impairs" its ability to provide services).

Here, California will suffer a concrete and particularized injury due to the loss of access to records at the National Archives at San Francisco. As discussed *infra*, California state agencies rely on access to records at the San Bruno facility to conduct research for construction projects, to evaluate those projects' environmental impacts as required by state and federal environmental laws, and to develop education and cultural programs. *See infra* Argument.I.C.2. Most of these records are not digitized. *See infra id.* I.C.1; *supra* Background.I–II. Closing the facility and dispersing the records to other facilities will deprive California agencies of reasonable access to documents essential for State business. *See infra* Argument.I.C.2. It will necessitate expensive out-of-state travel that must be paid by the State, create delays in projects that could jeopardize access to state funding, and undermine State agencies' ability to carry out programs that serve California residents. *See infra id*. Similarly, faculty and students at California's state universities—in particular universities in the Bay Area—depend on records at the San Bruno facility for their research into the State's rich history. *See infra id.* I.C.3. Without local access, that research will become cost prohibitive, and students will lose valuable opportunities to develop skills for archival research. Closure will also mean the loss of institutional knowledge of the archival staff, further impeding research and teaching. *See infra id*.

California's injury, caused by the loss of access to records at the facility, is the direct result of Defendants' decision to close the facility and transfer its records. An order declaring Defendants' action unlawful and vacating the closure and records transfer will redress that injury. *See Utah v. Evans*, 536 U.S. 452, 464 (2002) (redressability requires only "a change in a legal status" where "practical consequence of that change would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered").

In addition to constitutional standing, California has statutory standing under the APA. As a plaintiff seeking judicial relief under the APA, California must show that the interest it seeks to

vindicate "is arguably within the zone of interests to be protected . . . by the statute . . . in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). The relevant question is not whether "Congress specifically intended to benefit the plaintiff" in enacting the statutory provision at issue. *Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 492 (1998). Instead, the test is satisfied if the lawsuit has a "plausible relationship to the policies underlying the relevant statute." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). In light of "Congress's evident intent to make agency action presumptively reviewable," the test is not "meant to be especially demanding." *Id.* Indeed, the Supreme Court "conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).

California falls well within the zone of interests of the relevant statutory provisions of the National Archives and Records Administration Act ("NARAA") because its interests "are congruent with those of Congress and are not inconsistent with the purposes implicit in the statute." *California v. Trump*, 963 F.3d 926, 941–44 (9th Cir. 2020) (internal quotations omitted). Preserving historical documents for the public's benefit has been a fundamental purpose of NARA since its founding. Congress established the National Archives in 1934 to "preserve and care for the records of the U.S. Government."[3] It later enacted the Federal Records Act of 1950—the first comprehensive statute governing federal agencies' records management—similarly "to benefit and protect [the public's] interests." *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 55 (D.C. Cir. 1983). As evidenced in the text and legislative history of the 1950 Act, Congress "intended, expected, and positively desired [those] whose rights may have been affected by government actions to have access to the documentary history of the federal government." *Id.* at 57 (analyzing various statutory provisions and legislative reports). And in further recognition of NARA's obligation to preserve and make accessible historical records, Congress established NARA as an independent agency in 1984 when it enacted NARAA. Like the 1950 Act, NARAA includes numerous provisions that explicitly recognize the public's interest in having access to documents at the National Archives. *See infra* Argument.I.B.2.

---

[3] https://www.archives.gov/about/history (last visited Oct. 28, 2026).

Understood properly in the context of NARA's mission and the purpose of the federal records management scheme, the provisions granting the Archivist the authority to manage and maintain regional facilities are designed to facilitate the preservation and availability of historical documents for the public's benefit. *See Ariz. Mining Reform Coal. v. United States Forest Serv.*, 172 F.4th 641, 655–56 (9th Cir. 2026) (looking "beyond the section sued under the statute or act as a whole 'to understand Congress' overall purposes' in applying zone of interests test). Consistent with that statutory purpose, California seeks to protect its interest in state agencies' and researchers' continued access to records—access that is necessary to serve the public interest. California's lawsuit also furthers Congress's intent by seeking to ensure that Defendants consider the public interest in its decision-making process. *See California v. Trump*, 963 F.3d at 942–44 (finding California and New Mexico within zone of interests of statute governing budgetary transfer because their interest in reinforcing separation of powers principles aligned with that of Congress); *cf. Webster*, 720 F.2d at 56–57 (individuals and organizations seeking access to FBI records were within zone of interests of disposal laws as both "the pertinent records statutes" and their legislative history indicate Congress's intent to promote public access).

### B. Closure of the National Archives at San Francisco and Transfer of Its Records Is Arbitrary and Capricious

Under the APA, a court may set aside an arbitrary and capricious final agency action. 5 U.S.C. § 706(2)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024). An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency must also address and provide "adequate reasons" for rejecting "alternative" means of "achieving [its] objectives[.]" *Id.* at 48; *Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000) ("To be regarded as rational, an agency must

also consider significant alternatives[.]")

**1. Closure and transfer of records are final agency actions**

An agency action is final within the meaning of the APA if it is: (1) "the 'consummation' of the agency's decisionmaking process"; and (2) an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citations and quotations omitted). The finality element is "pragmatic," focusing on the "concrete consequences an agency action has or does not have." *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 956 (D.C. Cir. 2019); *see also U.S. Army Corps. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016). Both requirements are satisfied here.

First, the decision to close the San Bruno facility and transfer its records represents the culmination of Defendants' decisionmaking process. An agency's decisionmaking process is consummated when its position is "definitive." *Magassa v. Mayorkas*, 52 F.4th 1156, 1165 (9th Cir. 2022). Here, Defendants "ha[ve] rendered the last word" on the closure of the San Bruno facility. *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 586 (1980). They have publicly announced the closure as a definitive decision and have started to transfer records. *See* Compl. ¶ 42. Because there are no additional steps Defendants plan to take in deciding whether to close the facility, their action meets the first finality requirement. *Compare Tohono O'odham Nation v. Dep't of the Interior*, 138 F.4th 1189, 1201–02 (9th Cir. 2025) (limited notices to proceed were final agency action because they represented agency's "final decision" that requirements under programmatic agreement concerning preservation "had been satisfied" and that construction could therefore begin), *with Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 925 (9th Cir. 1999) (Forest Service's monitoring and reporting conducted before recommendation about changes to forest plan not final agency action because they were "only steps leading to an agency decision, rather than the final action itself").

Second, legal consequences flow from Defendants' actions. An agency action meets this requirement if it "impose[s] an obligation, den[ies] a right, or fix[es] *some* legal relationship as a consummation of the administrative process." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 986–87 (9th Cir. 2006) (emphasis original). Defendants' decision to close the National

Archives at San Francisco takes effect immediately and has a direct impact on the facility's operations, with appointments severely limited and the transfer of records already underway. *Id.* at 987 (agency action final if "it has a direct and immediate effect on the day-to-day business of the subject party"); *see New York v. Kennedy*, 155 F.4th 67, 75–76 (1st Cir. 2025) (agency announcement of layoff followed by dismantling of subagencies and layoff of federal workers constituted final agency action). The closure will also directly affect California: as discussed *supra*, NARA's announcement of the closure has already caused disruptions to state researchers' work due to the tightened availability of appointment slots, and the closure will have a direct effect on state agencies' day-to-day business by impeding their ability to provide public services.

**2. Defendants likely acted arbitrarily and capriciously by failing to consider the public's interest in access to National Archives records**

In deciding how to maintain and whether to discontinue access to a National Archives facility, the Archivist is required to consider what is "necessary or appropriate to perform" his function and that of NARA. 44 U.S.C. § 2104(d). While the phrase "necessary and appropriate" is "capacious[]" and "leaves agencies with flexibility," the Supreme Court has held that such statutory language requires agencies to "'consider an important aspect'" of their actions. *Michigan v. EPA*, 576 U.S. 743, 752 (2015). In identifying these "relevant factor[s]," the Court has looked to surrounding statutory language and "[s]tatutory context," *id.* at 752–53, as well as a statute's "purposes" and intended "operation," *Judulang v. Holder*, 565 U.S. 42, 55 (2011). By ignoring in its decisionmaking process the public's significant interest in access to National Archives records, Defendants likely failed to undertake the necessary reasoned decisionmaking.

NARA's mission is to "provide public access to Federal Government records in its custody and control."[4] Compl. ¶ 15. That mission aligns with Congress's intent, as expressed in the plain language of the records management statutes, to ensure public access to National Archives records. There, Congress made clear that NARA's responsibility to preserve access to records extends from their acceptance into the National Archives holdings to their disposal and transfer.

[4] https://www.archives.gov/about/history/about/history/history-and-mission (last visited Oct. 28, 2026).

For example, when the Archivist determines whether to accept and retain federal records from federal agencies, he can do so if he determines it "to be in the public interest," and may accept for deposit in the National Archives documents with "sufficient historical or other value." 44 U.S.C. § 2107(a)(1); *see also id.* § 2107(a)(2) (authorizing Archivist to, if in the public interest, direct and transfer records from a federal agency to the National Archives within thirty years after the records were created or received by the federal agency). Once records are in the Archivist's possession, he has an obligation to continue their preservation and ensure public access to them. *See, e.g.*, *id.* § 2109 (Archivist must preserve, arrange, repair and rehabilitate, reproduce, describe, and exhibit records and materials in his possession, and must prepare inventories, indexes, catalogues, and other aids and guides to facilitate public use of records); *id.* § 2203(g)(1) (placing affirmative duty on Archivist to make Presidential records available to the public as rapidly and completely as possible at end of a President's term); *id.* § 2107(a)(3) (Archivist may transfer records to public or educational institutions or associations if in the public interest); *id.* § 2114 (Archivist may provide motion picture films, still photographs, and sound recordings in his custody to be released and exhibited for non-profit educational purposes); *id.* § 2910 (Archivist must preserve Freedman's Bureau records to be "maintained for future generations" and create partnerships with institutions to index the records and make them more accessible to the public, including historians, genealogists, and students).

The legislative history confirms that NARA's primary obligation is the preservation of records for public access. In 1984, Congress enacted NARAA, which took NARA out from under GSA's umbrella and established it as an independent agency. *See* National Archives and Records Administration Act of 1984, Pub. L. No. 98-497, 98 Stat. 2280 (1984). In passing NARAA, Congress recognized the National Archives' mission as "the storage, disposition, preservation, and use for further government and private scholarly research of the records of enduring value of the United States Government." S. Rep. No. 98-373, at 3865–66 (1984). Congress also recognized that NARA's important mission in preserving federal records for the public's benefit was "fundamentally incompatible" with the mission of the GSA—public buildings management and maintenance, and federal property and services procurement and disposition. *Id.* at 3866. As a

former Archivist testified to Congress, "there is no way that an agency dedicated to encouraging scholarly research and other educational and cultural objectives can function effectively as a subordinate component of a business-oriented [agency] whose primary responsibilities are for construction and maintenance of public buildings." *Id.* at 3870. Taking that concern seriously, Congress established NARA as an independent agency and charged the Archivist with the obligation to "take all the steps needed to encourage, aid in, and ensure the creation and preservation and public availability of a full documentary record." *Id.* at 3885.

In deciding to close the National Archives at San Francisco, Defendants disregarded Congress' clear intent that the National Archives and its materials be maintained for the public's benefit. As discussed in detail *infra*, closing the San Bruno facility will make accessing records considerably more difficult or impracticable for those who rely on them—including state agency staff and researchers—and will effectively terminate access for local tribes and community members. *See infra* Argument.I.C. For the reasons discussed above, the loss of access cannot be solved by digitization. *See supra* Background.II. Indeed, NARA has presented no plan for when the records in the San Bruno facility will be digitized. And in many circumstances, digital records are an inadequate substitute for in-person access to the records, as important contextual information about a document is often lost in the process of digitization. *See, e.g.*, Ina Decl. ¶ 10.

In addition to the loss of public access to important records, Defendants' actions will result in the loss of institutional knowledge essential to the public's understanding and use of those records. As explained *infra*, researchers rely on the expertise of the archivists employed at the San Bruno facility to locate relevant documents. *See infra* Argument.I.C.3. That expertise comes from a deep familiarity with the record groups that can only be developed over time.

Nothing in what has been publicly reported or announced by Defendants after their decision to close the San Bruno facility indicates that Defendants considered the touchstone concern of public access to public records. *Infra* Background.II (mentioning only general considerations of costs and "real estate"). And crucially, there is no evidence that Defendants considered public access *before* making their decision. *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (stating "the orderly functioning of the process of review requires that the grounds upon which the

administrative agency acted b[e] clearly disclosed and adequately sustained”).

Defendants announced the closure of the facility without any prior consultation or discussion with State agencies and universities, tribes, or local stakeholders. They thus could not have considered how affected groups use the facility, the importance of access to local communities, and the significant disruption the closure would cause to those who rely on access to the facility’s records. *See Ramirez v. U.S. Immigr. & Customs Enf’t*, 471 F. Supp. 3d 88, 184 (D.D.C. 2020) (“To evaluate whether Defendants comply with the statute, the Court must evaluate not only the results of the decisionmaking processes, but the process itself.”), *modified sub nom.* 2026 WL 2719808 (D.D.C. Sept. 15, 2026). Nor did they consider factors such as increased travel costs to view the records after they are relocated. *See, e.g.*, *Novedades Y Servicios, Inc. v. Fin. Crimes Enf’t Network*, 181 F.4th 961, 975 (9th Cir. 2026) (finding regulation arbitrary and capricious where federal government failed to consider “the cost of compliance or any burden” on regulated entities). NARA’s mission, statutory scheme, and legislative history require that when making these types of decisions, NARA must consider the public’s interest in access to the records and the impact that the action will have on the public. *See Motor Vehicle Mfrs.*, 462 U.S. at 43 (“[Courts] must consider whether the decision was based on a consideration of the relevant factors” (quotation marks and citation omitted)).

There is no indication NARA considered how the closure fits with NARA’s core mission and the impact the closure will have on long-standing State and community interests in the facility’s holdings. NARA cannot show that its decision was the “output of a rational decision-making process,” because a rational decisionmaking process includes consideration of all relevant factors prior to taking significant agency action. *Nw. Env’t Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 690 (9th Cir. 2007) (finding no indication that agency considered the relevant facts before it changed “two-decade-old precedent” or that the decision was the “output of a rational decision-making process”). Defendants’ decision is thus arbitrary and capricious.

**3. Defendants’ failure to consider legitimate reliance interests is also arbitrary and capricious**

Under the APA, when an agency changes course, it must “be cognizant that longstanding

policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). "The Supreme Court has explained that an agency acts arbitrarily and capriciously if it changes course without first considering legitimate reliance interests in longstanding policies." *Pacito v. Trump*, 169 F.4th 895, 937 (9th Cir. 2026). Thus, before deciding to close the facility, NARA was "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020). NARA's failure to account for the reliance interests of State agencies and researchers, tribes, and community members is fatal. "It would be arbitrary and capricious to ignore such matters. [] Yet that is what [NARA] did." *Id.* at 30 (quotation marks and citation omitted).

An agency changes an existing policy when it "acts inconsistently with an earlier position" or abandons a "decades-old practice." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 569–70 (2025) (cleaned up). Since the National Archives at San Francisco opened in 1973, State agencies have used the records at the facility to conduct environmental review for state projects, as required by state and federal law. *See infra* Argument.I.C.2. Faculty and researchers at California's universities and colleges have also depended on access to the physical records at San Bruno to teach their classes, conduct academic research, write books, and attract students and other faculty to their campuses. *See infra id.* I.C.3.

Indeed, some professors have structured their research projects around the San Bruno facility's records with the understanding that they would remain available for the foreseeable future. *See* Hirota Decl. ¶ 8 ("I was prepared to go [to the San Bruno facility] frequently over the coming months and to dig into the materials there at length."); Lau Decl. ¶ 10 (noting that if the facility closed, Professor Lau "may [] be required to change the direction of [her] project"); Camacho Decl. ¶ 8 (stating that losing access to records "would likely [cause him to] end several areas of inquiry"); Magruder Decl. ¶ 7 (noting that closing the facility would "disrupt several ongoing faculty research projects"). University students have built their dissertations and research projects around records in the San Bruno facility; if the records were relocated, those students

would be forced to incur significant travel costs or abandon their projects altogether. *See* Magruder Decl. ¶¶ 8, 9, 11; Hirota Decl. ¶ 14; Kawano Decl. ¶ 10. Individuals have also relied on the continued existence of the San Bruno facility to discover their family histories, trace their ancestors' immigration into the United States, and advocate for causes pertaining to those records. Korematsu Decl. ¶¶ 13, 17, 18; Petersen Decl. ¶¶ 5, 10, CILS Compl.

NARA was required to assess these reliance interests, determine if they were significant, and weigh these interests against competing policy concerns. *See Regents of Univ. of Cal.*, 591 U.S at 33; *id.* at 31 ("[Consideration of] reliance interests . . . must be undertaken by the agency in the first instance.") There is no evidence that NARA did so. Rather, NARA announced the San Bruno facility's closure first in an email to staff and then in an update on its website without first considering the significant interests it would disrupt. NARA failed to notify the State prior to the announcement, turning a blind eye to the State's need for the records housed at San Bruno. There is also no evidence NARA considered the significant interests of tribes and their members. NARA only announced that it would hold two tribal listening sessions to "engag[e] with tribes to better understand the [closure's] impact" three months after announcing the closure and one month after announcing where records related to tribes would be moved.[5] Compl. ¶ 43. By not taking these reliance interests into account prior to the closure, and only attempting to mitigate impact on these interests after the fact, NARA failed to engage in the reasoned decision-making that the APA requires.

### C. California Will Suffer Irreparable Harm Absent a Preliminary Injunction

"The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020) (quotation marks and citation omitted). Section 705 likewise authorizes courts to "preserve status or rights pending" review proceedings "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705; *Immigr. Defs. L. Ctr.*, 145 F.4th at 986 (noting that Section 705 and preliminary injunction requirements overlap). The testimony of multiple California state agencies, dozens of university professors and administrators, local

---

[5] *See* https://www.archives.gov/research/news (last visited Oct. 28, 2026).

organizations, and historians, among others, establishes that the closure of the National Archives at San Francisco and the removal of archival records from Northern California is likely to cause irreparable harm to Plaintiff State of California and the California public at large. Many of these declarants establish that they need to access these records for existing research and government projects, such that Defendants' ongoing implementation of the closure and records-transfer imposes a present harm. And more broadly, the effect of the record-transfer and closure of the National Archives at San Francisco would be devastating from a cultural, educational, and financial standpoint to the State and her people.

**1. The only way to access most of the records is in person**

The National Archives at San Francisco is an extensive collection of culturally important archival materials, particularly for members of the Asian American, Pacific Islander, Native American, and other immigrant and minority communities. Sueyoshi Decl. ¶ 4. For example, the facility houses the only collection of physical records from the Angel Island Immigration Station, the Chinese Exclusion Act era, Japanese internment during World War II, and Native Hawaiian and Samoan experiences under U.S. territorial governments. Leong Decl. ¶ 4; Kawano Decl. ¶ 5. The records include personal records and case files from Wong Kim Ark and Fred T. Korematsu, who were the subject of two of the most prominent Supreme Court decisions in our nation's history. *See* van Harmelen Decl. ¶ 9; Korematsu Decl. ¶ 22; *United States. v. Wong Kim Ark*, 169 U.S. 649 (1898); *Korematsu v. United States*, 323 U.S. 214 (1944).

The vast majority of records housed at the National Archives at San Francisco are not digitized, or otherwise cannot be digitized, and can only be accessed in person. Sueyoshi Decl. ¶ 4; Leong Decl. ¶¶ 4–6; Camacho Decl. ¶ 4; Hirota Decl. ¶ 9; *see also* Tonenna Decl. ¶ 11, CILS Compl. (discussing need to physically inspect Bureau of Indian Affairs files). For example, hand and typewritten records produced during the paper-rationing of World War II used paper often made from thinner and more fragile stocks from lower-grade pulp, and government records from the early twentieth century were often printed on acid paper prone to degradation. Leong Decl. ¶ 6; van Harmelen Decl. ¶ 11. Other records are too voluminous to practically scan or photocopy, such as the 58 physical boxes of Deportation Investigation Case Files assembled by federal

immigration officials in the early 1900s or the Alien Files, each of which is typically around 200 pages long. Lau Decl. ¶¶ 6–7; Leong Decl. ¶ 6. And even if the records could theoretically be digitized, experts have grave concerns about the potential damage that a move could cause such fragile, delicate, and priceless records. *See* Yang Decl. ¶ 11; Camacho Decl. ¶ 10. These concerns are particularly acute given that the Inspector General recently criticized NARA for failing to adhere to preservation standards in its records relocation process. Compl. ¶ 44.

**2. The closure will irreparably harm the work of State agencies**

Plaintiff State of California itself relies heavily on the records contained in the National Archives at San Francisco. Multiple state agencies are required to visit the facility to access records necessary to perform their essential functions. For example, the California Department of Parks and Recreation ("State Parks") must visit the National Archives at San Francisco to effectively perform the environmental evaluations required under federal and state law prior to undertaking certain construction or refurbishment projects on historical facilities. Dewey Decl. ¶ 3. When State Parks refurbished the barracks at the Angel Island Immigration Station in the 2000s, agency staff and contractors visited the San Bruno facility approximately ten times to view historical records, maps, and photographs necessary to properly evaluate the project consistent with federal and state environmental laws and regulations. *Id.* ¶¶ 4–5. State Parks staff will be required to do similar evaluations on other upcoming projects on Angel Island and other historical sites throughout the state, and closing the San Bruno facility would delay, frustrate, or prevent the agency from performing those evaluations. *Id.* ¶¶ 6–7.

State Parks also needs access to the San Bruno facility to perform research necessary to create cultural and educational programs concerning some of its parks, such as an ongoing project about ending discrimination in the military at Ford Ord Dunes. Holm Decl. ¶ 4. The imminent closure of the National Archives at San Francsico would dramatically delay that project, possibly enough to lead to the loss of committed funds. *Id.* And an upcoming Dust Bowl exhibit slated to open soon in Kern County could also be delayed indefinitely, as all of the records and materials necessary for that exhibit are housed at the San Bruno facility. *Id.* ¶ 5.

Similarly, Caltrans requires access to the San Bruno facility to perform thorough

environmental reviews on historical properties statewide. Price Decl. ¶¶ 3–4. These environmental reviews are governed by strict legal standards, including the National Environmental Policy Act, the California Environmental Quality Act, and a host of other federal and state environmental laws and regulations. *Id.* ¶ 2. Closing the National Archives at San Francisco "has the potential to lower the quality and comprehensiveness of the environmental evaluations that Caltrans is required to make under federal and state law." *Id.* ¶ 6.

**3. The closure will irreparably harm California's faculty and students**

It is difficult to overstate how devastating the closure of the National Archives at San Francisco would be to hundreds of California's faculty and students who rely on the facility to do necessary cultural and educational research. Indeed, the closure is likely to cause delays in graduation or certification for many California students. Magruder Decl. ¶ 8.

Countless scholars, historians, and administrators across California regard in-person visits to the facility as essential for their research and that of their students. For example:

- **Assistant Professor Andrew Way Leong at UC Berkeley** uses the National Archives in San Francisco several times a semester to further his research into the literature of Japanese diasporas, including a project analyzing Japanese language literary journals produced by inmates at the Tule Lake Segregation Center during World War II. Leong Decl. ¶¶ 2, 4. Closing the San Bruno facility and moving these records will cause great harm to his research, end areas of inquiry, delay crucial projects, and increase research costs to prohibitive levels for him, his students, and the University. *Id.* ¶¶ 7–11.
- **Associate Professor Hidetaka Hirota at UC Berkeley** and his graduate students extensively use the National Archives at San Francisco to review original materials and records relevant to the history of immigration law and policy in the United States, particularly around the differences between Chinese, Japanese, and other immigrant groups. Hirota Decl. ¶¶ 2–8, 10. Closing the facility will have a "catastrophic impact" on his work, driving research costs to prohibitive levels for him and his graduate students and irreversibly impairing the speed and quality of their scholarship. *Id.* ¶¶ 11–15.
- **Assistant Professor Kourtney Kawano at UC Berkeley** and her undergraduate students

regularly use the National Archives at San Francisco to access records necessary to verify and enhance oral and written histories from Native Hawaiian, Pacific Islander, and other immigrant cultural groups. Kawano Decl. ¶¶ 2–7. Closing the facility will "completely derail" her current research project and those of her students, ending many areas of inquiry already in progress as traveling out of state for an undergraduate research project is impractical. *Id.* ¶¶ 8–10.

- **Provost Amy Sueyoshi at San Francisco State University ("SFSU")** used the National Archives at San Francisco extensively to conduct research for two books and several academic papers on the intersection of Asian American and queer identities. Sueyoshi Decl. ¶ 3. In her twenty years at SFSU, she has witnessed "hundreds of students who have had an existential shift at the archive and where they came to see themselves and their communities as part of American history," and has observed several faculty use records at the San Bruno facility as well. *Id.* ¶¶ 4–5. Closing the San Bruno facility will make this invaluable resource "effectively cease to exist for SFSU faculty and students." *Id.* ¶ 6.
- **Associate Professor Chrissy Lau at SFSU** uses the National Archives at San Francisco for her own research into undocumented immigration, particularly during the period of Chinese Exclusion. Lau Decl. ¶¶ 2–7. She also uses the facility to obtain original sources for her SFSU classes and mentor young researchers. *Id.* ¶¶ 13–15. Closing the San Bruno facility will "significantly harm" her current research project and greatly diminish the speed and quality of her work, while also depriving her students of a valuable academic resource. *Id.* ¶¶ 10–12, 15.
- **Professor Alice Yang at UC Santa Cruz** and her students use the National Archives at San Francisco to research and learn about Asian American Pacific Islander history, historical memory, and Asian American immigration. Yang Decl. ¶¶ 3, 5, 9. Closing the San Bruno facility will harm both her research and her teaching, as traveling to view the records in a more remote location would be cost prohibitive. *Id.* ¶¶ 10–12.
- **Professor Keith L. Camacho at UCLA** and his students regularly use the National Archives at San Francisco to research Chamorro cultural and historical politics, as well as

Japanese and American imperialisms. Camacho Decl. ¶¶ 2, 4–6. Professor Camacho regularly visits the San Bruno facility and often assigns work to his students that requires them to visit the facility, with some trips being paid for by the University. *Id.* ¶ 6. Closing the National Archives at San Francisco will make such trips impractical or impossible, and will end many areas of inquiry for him and his students. *Id.* ¶¶ 7–11.

- **Emily Magruder, Director of Future Faculty Development for the California State University System** believes that closing the National Archives at San Francisco would have broad-ranging negative effects for faculty and students, including disrupting current research projects, losing research opportunities, and delaying degree completion for students who rely on the facility. Magruder Decl. ¶¶ 6–9.

These irreparable harms are not speculative and indeed have already begun to materialize. The haphazard way NARA announced the closure has led to significantly long wait times for research desks at the San Bruno facility and has already impaired the speed and quality of necessary research. Leong Decl. ¶ 12; Lau Decl. ¶ 12. Moreover, the records would be completely unavailable while they are being relocated and processed at new facilities, further preventing faculty and students from accessing the materials as a resource. Even if it were possible to simply digitize the records prior to the move, students and faculty will be forever deprived of the benefit of the institutional and cultural knowledge of the San Bruno facility's trained and knowledgeable archival staff. Leong Decl. ¶ 11; Lau Decl. ¶ 9; Hayashi Decl. ¶ 7; Camacho Decl. ¶ 9.

#### 4. The closure would irreparably harm California's people

While scholars and agencies will be immediately and irreparably harmed by the closure of the National Archives at San Francisco, the damage done to California's general population is just as great. The facility houses a trove of information about the region that is crucial to understanding the history of California and her people. Depriving Californians of meaningful access to the San Bruno facility deprives them of meaningful access to their history.

For example, records and case files concerning the internment of American hero and Japanese internee Fred T. Korematsu are housed at the San Bruno facility. Korematsu Decl. ¶ 17. Karen Korematsu, Fred's daughter, founded an institute that has relied heavily on the San Bruno

facility to develop educational exhibits and programs to help fulfill the institute's goal to fight discrimination. *Id.* ¶¶ 10, 20. Closing the San Bruno facility would make it significantly more difficult for Karen Korematsu and the institute to continue their work. *Id.* ¶¶ 17, 19–21.

Many individuals use the facility to learn about their personal histories in America. As previously mentioned, Dr. Satsuki Ina used the National Archives at San Francisco to trace her own heritage as a survivor of Japanese internment and her birth in the Tule Lake Segregation Center, where she discovered a physical record of her birth labeling her an alien enemy of the state when she was only four months old. Ina Decl. ¶¶ 2–7. Dr. Ina was also able to use the San Bruno facility to trace the path her parents took through the internment system, as her parents were separated into different facilities and ultimately resisted deportation attempts despite their family's United States citizenship. *Id.* ¶ 6. At 82 years old, Dr. Ina would be effectively prevented from continuing her research into her family history by the closure and removal of the records at the facility. *Id.* ¶¶ 9–10. The closure would also be detrimental to cultural institutions like the Japanese American National Museum in Los Angeles, which depends on the National Archives at San Francisco to give context and history to the artifacts it receives from donors. Hayashi Decl. ¶¶ 2–8. These detrimental effects would be felt most by lower income and minority Californians who lack the resources to travel out of state to access records relevant to their histories. Magruder Decl. ¶ 11; Camacho Decl. ¶ 8; *see also* Petersen Decl. ¶¶ 4, 20, CILS Compl. (discussing impact on tribal communities and organizations ); Tonenna Decl. ¶¶ 8, 12, 16, CILS Compl. (same).

### D. The Balance of Harms and Public Interest Support an Injunction

For the reasons stated above, there is a strong public interest in preventing the unlawful closure of the San Bruno facility and the removal of its records from their place of relevance. There is also "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 678 (9th Cir. 2021) ("The government's failure to comply with the APA . . . weighs in favor of granting injunctive relief."), overruled on other grounds by *Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622 (9th Cir. 2026). This principle is particularly salient here, where NARA's mission is to

preserve public access to the Nation's historical documents, and closing the San Bruno facility would deny that access to the communities most deeply connected to the records housed there.

The equities also weigh particularly strongly in Plaintiff's favor due to the federal government's failure to consult with the State, tribes, or community organizations and individuals who rely on the records regularly. Defendants have not demonstrated any commitment to minimizing the impacts of the anticipated closure on those groups, delaying the impacts of the closure, or ensuring that those groups will have adequate access to the records they rely on.

By contrast, Defendants would not be harmed by an injunction. Significantly, "the government cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) (internal quotation marks omitted). Defendants will suffer no harm from being required to comply with their statutory mandate to preserve public access to records, or from having to engage in thorough reasoned decisionmaking, as required under the APA. Neither will enjoining Defendants cause them to suffer any practical harm. Although Defendants have been unequivocal that the San Bruno facility will be closed, Defendants have not announced a clear timeline for moving records or closing the facility, only that closure will happen in "the next few years" and that records will be moved "within the next few months." Compl. ¶ 34. And Defendants' actions in this litigation—including their changing positions on whether the imminent transfer of records can be paused—undermine any suggestion that they will suffer irreparable harm while the Court resolves this lawsuit. Downs Decl. Ex. C. Defendants thus cannot show that an injunction will meaningfully disrupt NARA's operations.

## CONCLUSION

Plaintiff respectfully requests the Court issue a preliminary injunction enjoining Defendants from transferring records from the National Archives at San Francisco and from taking any action to consummate closure of the facility while litigation is pending. In the alternative, Plaintiff respectfully request that the Court issue a stay pursuant to 5 U.S.C. § 705.

Dated: November 12, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
LARA HADDAD
R. MATTHEW WISE
Supervising Deputy Attorneys General

/s/ *Carolyn Downs*
CAROLYN DOWNS
NANDING CHEN
JOE MEEKER
S. CLINTON WOODS
Deputy Attorneys General
*Attorneys for Plaintiff State of California*

SA2026304627
68785090

# CERTIFICATE OF SERVICE

Case Name: ***State of California v. United States National Archives and Records Administration, et al.*** Case No. **5:26-cv-11868-NW**

I hereby certify that on November 12, 2026, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1. **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION OR STAY**
2. **DECLARATION OF CAROLYN DOWNS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
3. **DECLARATION OF PROFESSOR KEITH L. CAMACHO IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
4. **DECLARATION OF BRIAN DEWEY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
5. **DECLARATION OF JONATHAN VAN HARMELEN IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
6. **DECLARATION OF KRISTEN HAYASHI IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
7. **DECLARATION OF ASSOCIATE PROFESSOR HIDETAKA HIROTA IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
8. **DECLARATION OF HEATHER HOLM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
9. **DECLARATION OF SATSUKI INA IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
10. **DECLARATION OF ASSISTANT PROFESSOR KOURTNEY KAWANO IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
11. **DECLARATION OF CAITLIN KELIIAA IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
12. **DECLARATION OF KAREN KOREMATSU IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
13. **DECLARATION OF ASSOCIATE PROFESSOR CHRISSY LAU IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
14. **DECLARATION OF ASSISTANT PROFESSOR ANDREW LEONG IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
15. **DECLARATION OF EMILY MAGRUDER IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

16. **DECLARATION OF DAVID PRICE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
17. **DECLARATION OF PROVOST AMY SUEYOSHI IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
18. **DECLARATION OF ALICE YANG IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
19. **[PROPOSED] ORDER**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on November 12, 2026, at San Francisco, California.

| M. Mendiola | M. Mendiola |
|---|---|
| Declarant | Signature |

SA2026304627