ROB BONTA
Attorney General of California
LARA HADDAD
R. MATTHEW WISE
Supervising Deputy Attorneys General
NANDING CHEN (SBN 348808)
JOE MEEKER (SBN 335725)
S. CLINTON WOODS (SBN 246054)
CAROLYN DOWNS (SBN 353455)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6720
Fax: (916) 731-2124
E-mail: Carolyn.Downs@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br><br>Plaintiff,<br><br>**v.**<br><br>**UNITED STATES NATIONAL ARCHIVES AND RECORDS ADMINISTRATION; BRADFORD WILSON,** in his official capacity as Archivist of the United States,<br><br>Defendants. | Case No. 5:26-cv-11868-NW<br><br>**DECLARATION OF JONATHAN VAN HARMELEN IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Jonathan van Harmelen, declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I am a historian of 20th century United States history. I specialize in Asian American history and American political history, with a particular focus on immigration history

and civil rights issues. I am an expert on Japanese American history, and have extensively research the incarceration of Japanese Americans during World War II.

3. I received my Ph.D. in history from the University of California, Santa Cruz. My forthcoming book (based on my dissertation), *Legislating Justice: Japanese Americans, Congress, and the Wartime Incarceration of Japanese Americans During World War II,* explores Congress's role in the incarceration of Japanese Americans. My book uncovers the relationship between Congress and Executive Authority during wartime and the evolution of congressional policy regarding immigration and civil rights.

4. I received my B.A. in History from Pomona College, and my M.A. in Global, International, and Comparative History from Georgetown University. I previously taught as a lecturer at UC Santa Cruz and as a visiting assistant professor of History at Oberlin College from 2025 to 2026.

5. I am a regular contributor to local and national news outlets, including *The New Republic*, *The New York Times*, *The Seattle Times,* and *The Nation*. I have also written for blogs such as the Japanese American National Museum's publication *Discover Nikkei*.

6. I now serve as a Staff Historian and Editorial Manager of Densho, a digital archives and public history organization based in Seattle that focuses on preserving and sharing the history of Japanese Americans. I manage the Densho Encyclopedia, the largest digital database on Japanese American history.

7. My work as a historian is rooted in archival research, and I rely heavily on records housed in the San Bruno Archives for my research and my work at Densho. Any historian of U.S. immigration history, Western U.S. history, or Native American history would need to use the records at the San Bruno Archives.

8. The San Bruno Archives serve as one of the largest repositories of Western United States history and immigration history. The facility houses major collections concerning the history of tribes in Northern California and immigration records for immigrants who went through San Francisco as the port of entry. Of particular significance are records concerning the

Angel Island Immigration Station, the primary immigration and detention center on the West Coast built to enforce the Chinese Exclusion Act of 1882.

9. The San Bruno Archives also house records for the Ninth Circuit, including casefiles for *United States* v. *Wong Kim Ark*, the case which affirmed birthright citizenship. The Ninth Circuit files also contain casefiles pertaining to civil rights cases such as *Westminster v. Mendez* (1947), and *Acheson v. Murakami* (1949). The San Bruno Archives also contain important records pertaining to the incarceration of Japanese Americans during the war. In my research, for example, I have relied on records concerning the Wartime Civil Control Administration and the War Relocation Authority in the Archives. Those records provided valuable information on both the general operations of the incarceration of Japanese Americans and specific topics such as medical care and quarantine in the War Relocation Authority camps. I have also used Ninth Circuit casefiles to research the history of immigration enforcement. For example, I relied on files of the case *Soewapadji v. Wixon* (1947), which examined the deportation of some 250 Indonesian seamen applying for political asylum as refugees in Indonesia's battle for independence, to produce a study on post-World War II refugee policy.

10. Those records are available only at the San Bruno Archives. NARA has announced that judicial records and records concerning World War I and World War II will be moved to Kansas City. Moving the records away from San Bruno will deprive Asian American communities and tribes in California of access to their own history.

11. The transfer of records will introduce risks to documents that are fragile and require special care such as climate control. Government records from the first half of the 20th century, which are often printed on acid paper, degrade over the years with oxidation. Many such records would be potentially damaged during the transportation process.

12. The loss of access is not solvable by digitization. As of October 2026, only 4% of NARA's holdings have been digitized. It would take years if not decades to digitize the collection at San Bruno because of its volume. Digitization is a slow, delicate, and expensive process, and there is grave doubt as to NARA's capacity to handle such a project given the extensive cuts to its budget.

13. Densho as an organization has been involved in preserving records through digitization, and our experience has taught us that even with the best technology, files can be lost in the process. And the quality of digitization is also not always consistent. Transcription can introduce errors, and the scans can sometimes be hard to read. It is therefore important for researchers to have the original files as reference.

14. Moving records from the San Bruno Archives to Kansas City would dramatically reduce accessibility by requiring researchers from Northern California to travel to Kansas City, which would prove for many to be cost-prohibitive. The ability for researchers to request digital copies of their records, while possible, would be reduced by the overwhelming burden placed on the staff at the Kansas City facility to respond to additional requests.

15. Even assuming researchers have the means to travel, accessibility could still be an issue. There are not that many appointment slots available at the Kansas City Archives to begin with, and it would only be more difficult to secure an appointment if that facility becomes responsible for a large volume of records from San Bruno. It is a lot of pressure on the Kansas City facility to absorb those records.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 14th day of October, 2026, in Sacramento, California.

Jonathan van Harmelen
Jonathan van Harmelen, Ph.D