ROB BONTA
Attorney General of California
LARA HADDAD
R. MATTHEW WISE
Supervising Deputy Attorneys General
NANDING CHEN (SBN 348808)
JOE MEEKER (SBN 336725)
S. CLINTON WOODS (SBN 246054)
CAROLYN DOWNS (SBN 353455)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6720
Fax: (916) 731-2124
E-mail: Carolyn.Downs@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br>Plaintiff,<br>**v.**<br>**UNITED STATES NATIONAL ARCHIVES AND RECORDS ADMINISTRATION; BRADFORD WILSON,** in his official capacity as Archivist of the United States,<br>Defendants. | Case No. 5:26-cv-11868-NW<br><br>**DECLARATION OF ASSOCIATE PROFESSOR HIDETAKA HIROTA IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Hidetaka Hirota, declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I am an Associate Professor of History at the University of California at Berkeley, where I have taught since fall 2022. I am a social and legal historian of the United States specializing in immigration, including the history of U.S. immigration law and policy and how it

has developed since the 19th century. Much of my work, including my current work, involves reviewing original materials and primary sources, which include the historical records and archives housed at the San Bruno National Archives Facility ("San Bruno Archives").

3. The San Bruno Archives contains a unique collection of materials indispensable to my field of study, including the records of the federal immigration service between the late 19th and early 20th centuries. The San Bruno Archives holds, along with many other collections, records from two regional "districts" of the U.S. Bureau of Immigration and later the Immigration and Naturalization Service (INS)—San Francisco and Honolulu—which both processed numerous immigrants from many countries, especially China and Japan, during that time period. Those records have been invaluable to my scholarship, including my research while working at the University.

4. For example, as part of my research into the origins of immigration restrictions in the United States, I was interested in how immigration bureau headquarters in Washington, D.C. communicated with its district branches in the late 19th century—when federal immigration restrictions were first established—including how the bureau instructed its branches to implement federal policy. As part of that project, in 2012 I visited the San Bruno Archives to review records of communications between bureau headquarters and the San Francisco district.

5. More recently, as part of my work for the University, I have been working on a project about the history of labor migration, including how the federal government has restricted the immigration of foreign workers over time. As part of this research, I conducted intensive research at the San Bruno Archives in 2015 to review INS case files for individual immigrants who arrived in San Francisco and Honolulu in the first half of the 20th century. The San Bruno Archives holds tens of thousands of such records.

6. One subject of particular relevance to this research is the Alien Contract Labor Law of 1885, which prohibited the admission of "contract workers" who arrived in the United States with pre-arranged employment. At the turn of the 20th century, even some federal officials were unsure about what, exactly, constituted a "contract" for the purposes of the Act, or what was considered to be evidence of a contract. The INS case files held in the San Bruno Archives allow

me to see how that law was implemented in practice for individual immigrants, including the standards and procedures that were established in the process, how individual officials interpreted the law, what questions they asked immigrants to determine whether they were contract workers or not, and how immigrants responded to interrogation by the officials.

7. The records in the San Bruno Archives are uniquely helpful for revealing differences in how federal immigration officials approached immigrants from different countries. For example, Japanese and Chinese immigrants were subject to different sets of laws. While Chinese immigration was regulated by federal "Chinese exclusion" laws that targeted the Chinese in particular, the admission of Japanese immigrants was administered by "general" immigration laws that applied to all foreigners except the Chinese, such as the alien contract labor law. Comparative review of case files, therefore, helps us better understand the overall working of federal immigration policy across different ethnic groups. The case files also give unique insight into the mindset of federal immigration officials. Among other things, the files I have reviewed demonstrate how officials approached immigrants with deep prejudice and often presumed that Japanese immigrants, as a group, were trying to enter the country illegally. Together, these records have given me a much clearer and more accurate picture of how federal immigration policy actually functioned during the time relevant to my research.

8. I had completed the bulk of my research on this project by the time I arrived at Berkeley in 2022, and the last few years have been spent on the writing stage. But recently, as I've begun to edit and refine my drafts, I've started revisiting the San Bruno Archives to review the records there. In fact, as of the date of this declaration, I have an appointment at the San Bruno Archives just next week (October 14-16, 2026). I was prepared to go there frequently over the coming months and to dig into the materials there at length. These visits would support not only my current project but also my new research on Japanese immigrants' legal encounters in the United States.

9. Very few of the records relevant to my research at the San Bruno Archives have been digitized. The National Archives have scanned some case files, but the scale of digitization is so limited that the scanned records are nowhere near enough to give me a real sense of how

immigration policy operated in the late 19th century. Indeed, less than two percent of the immigration case files stored at the San Bruno Archives are available online. The vast majority of the materials require in-person visits to the facility for access.

10. In addition to my own work as a researcher, I have recommended many graduate students to visit the San Bruno Archives to further their research, especially for their doctoral dissertations. I currently advise three graduate students and mentor two more graduate students working on projects related to U.S. immigration history, and all five need access to the records in the San Bruno Archives to complete their projects. It is my understanding that those students need to make regular visits to the San Bruno Archives.

11. If the San Bruno Archives closed, it would have a catastrophic impact on my work and the work of others.

12. The closure of the San Bruno Archives would cause my research expenses, and the expenses of other researchers at the University, to skyrocket. Currently, I am able to make short day trips by car or train to the San Bruno Archives as needed to conduct research. But if the records at the San Bruno Archives were moved to another location, such as Kansas City, I would be required to plan lengthy trips to the new facility to review records. Berkeley would incur additional costs from that travel, such as the cost of my flights and a hotel stay.

13. Relocating the records will also likely make my time spent reviewing materials much less efficient. In my research, as every researcher does, I rely on the archivists at the San Bruno Archives to help find and identify relevant records and materials. Most of the materials in the San Bruno Archives are not fully indexed. The archivists at the San Bruno Archives have expertise and familiarity with the sources and materials that are not indexed, and their assistance is vital to my work. The archivists have helped me to locate records that I would not have been able to on my own—or at least, finding them would have taken much more time. If the records were moved to a new facility, the archivists there would likely need to learn about those sources from scratch, which would take a tremendous amount of time and effort. Without expert assistance from the archivists, my research will take much more time to complete, which would require even lengthier trips and incur further costs.

14. The closure of the San Bruno Archives would have a particularly devastating effect on the work of my graduate students. Graduate funding is limited, and relocation would further constrain their finances: research that was previously easy to do locally would now incur significant travel expenses. In addition, graduate students have a soft time limit to complete their dissertations. Ph.D. students working on U.S. history at Berkeley generally receive six-year funding package, and it will be increasingly difficult to complete a dissertation in six or even seven years if students need to travel long distances to conduct their research. If travel-related delays require extending a student's program, we may need to find additional funding for those students, which would be an additional expense to the University.

15. Closing the San Bruno Archives would also be a tremendous loss to Berkeley as a whole. Easy access to the San Bruno Archives is one of the things that attract graduate students to study here. The same way that the University of Maryland presumably attracts students with proximity to the National Archives in Washington D.C. and College Park (for example), Berkeley attracts students from across the world and the United States based on its proximity to the San Bruno Archives and easy access to the records found there. In particular, the San Bruno Archives are one of the most important repositories for scholars of U.S. immigration history, Asian American history, and Ethnic Studies, and easy access to the San Bruno Archives has been a major intellectual attraction for top students interested in these fields and, consequently, has contributed to Berkeley's reputation as one of the best research universities in the United States and even the world. I expect that if the San Bruno Archives closed, graduate student recruitment would suffer.

16. Finally, closing the San Bruno Archives would harm members of the local community, who would lose access to important records about their own history. The proximity of the San Bruno Archives is especially important for Asian Americans in the Bay Area because it allows them to access direct records about their ancestors and families, such as the immigration case files I discussed. While closing the San Bruno Archives and relocating its materials to a new facility would be a severe inconvenience for academics like myself, it would be even harder for non-academic citizens interested in uncovering their family history but without research funds.

Many of them would almost certainly find it extremely difficult to justify traveling across the country to another facility. Relocating historical materials of local communities beyond the reach of local citizens could lead to the loss of the memories and legacies of their own communities. It is incredibly important that local history stays local.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this ninth day of October, 2026, in Berkeley, California.