ROB BONTA
Attorney General of California
LARA HADDAD
R. MATTHEW WISE
Supervising Deputy Attorney General
NANDING CHEN (SBN 348808)
JOE MEEKER (SBN 336725)
S. CLINTON WOODS (SBN 246054)
CAROLYN DOWNS (SBN 353455)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6720
Fax: (916) 731-2124
E-mail: Carolyn.Downs@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br><br>Plaintiff,<br><br>**v.**<br><br>**UNITED STATES NATIONAL ARCHIVES AND RECORDS ADMINISTRATION; BRADFORD WILSON,** in his official capacity as Archivist of the United States,<br><br>Defendants. | Case No. 5:26-cv-11868-NW<br><br>**DECLARATION OF KAREN KOREMATSU IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Karen Korematsu, declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I am the founder, President and CEO of the Fred T. Korematsu Institute and the daughter of Fred Korematsu, the late civil rights icon who fought against Japanese American incarceration during World War II. Since my father's passing in 2005, I have carried on his

legacy as a national public speaker and educator, traveling throughout the country to advocate for civil liberties, social justice, civics, and ethnic studies education.

3. In 2009, I established the Fred T. Korematsu Institute to continue my father's legacy as an American civil liberties advocate. Through the Institute, I educate audiences of all ages about the World War II incarceration of Japanese Americans and inspire them to stand up for the civil and human rights of all Americans.

4. My work shares my father's story, explores the legal history of his case, and highlights its relevance to contemporary issues. I also promote Fred Korematsu Day of Civil Liberties and the Constitution, observed annually on January 30, to encourage ongoing education and advocacy for civil liberties across the nation.

5. I have presented to K-12 schools, colleges, universities, law schools, and national and state conferences, including the National Judicial College, the Ninth Circuit Judicial Conference, and the South Carolina State Judicial Conference. I have also signed onto amicus briefs in several cases challenging violations of constitutional rights arising after September 11, including *Odah v. United States*, *Turkman v. Ashcroft*, *Hedges v. Obama*, *Hassan v. City of New York*, and *Trump v. Hawaii*.

6. I am a member of the National Council for the Social Studies (NCSS) and an Honored Member of the Council of State Social Studies Specialists (CS4). In 2015, I became the first non-lawyer inducted into the National Asian Pacific American Bar Association. I also serve on the National Advisory Board of the Fred T. Korematsu Center for Law and Equality at the University of California, Irvine, School of Law. In June 2021, California State Superintendent of Public Instruction Tony Thurmond appointed me as a State of California Education Ambassador.

7. I have been interviewed on radio, podcasts, and television, and my opinion pieces have appeared in *The New York Times* and *The Washington Post*. I have received numerous awards and honors in recognition of my advocacy and educational work. In May 2019, I received an honorary Doctor of Humane Letters from Saint Michael's College in Burlington, Vermont. In May 2022, I received a second honorary Doctor of Humane Letters from Haverford College in Pennsylvania.

8. My father was born in Oakland, California in 1919 and spent his early life in Oakland. After high school, he became a welder. In 1942, President Franklin D. Roosevelt issued Executive Order 9066 authorizing the removal and forced incarceration of individuals of Japanese ancestry. My father refused to go to the incarceration camp and was arrested on May 30, 1942 in San Leandro, California for disobeying the military orders and was convicted as a result. He appealed his conviction all the way to the United States Supreme Court, and the Court upheld the policy in the infamous decision *Korematsu v. United States*.

9. After my father's bail hearing in San Francisco, he was taken by Military Police to the San Francisco Presidio, U.S. 4th Army Western Defense Command and later transferred to the Tanforan Detention Assembly Center in San Bruno, California. Several months later, my father was taken to the Central Utah War Relocation Center in Topaz, Utah. He spent his life after his release fighting against racism. A few months before he passed away in 2005, my father charged me with carrying on with education and telling his story.

10. In 2009, I founded the Fred T. Korematsu Institute, which focuses on advancing social justice and promoting civic engagement through educational programs, media and exhibits, and advocacy work. Using Fred Korematsu's story as a powerful entry point, the Fred T. Korematsu Institute's programs introduce audiences to a wide range of interconnected topics, including the WWII Japanese American incarceration, civil liberties and constitutional rights, immigration and citizenship, social justice, racial discrimination, loyalty and resistance, belonging and othering, solidarity, resilience, civic engagement, moral principles, and the importance of speaking up for others. By grounding these complex themes in human stories, we help people see their relevance today and inspire them to take meaningful action.

11. Our programs include:

- **Traveling Exhibition**: **"AM I AN AMERICAN OR AM I NOT?" – Fred Korematsu:** Creates more informed citizens who are inspired to take action and speak up for the rights of their neighbors. By incorporating related historical and contemporary topics, it connects with a wide array of visitors who see reflections of themselves or their communities in the stories we share.

- **Educator Workshops:** Deepen educators' knowledge and strengthen their practice teaching about the WWII Japanese American incarceration, *Korematsu v. United States*, and related history and social studies topics in their state standards.
- **Speaking Engagements**: Inspire audiences of all ages—from kindergarteners to federal judges—to follow Fred Korematsu's advice to "stand up for what is right."
- **Content Library & Toolkits**: Equip teachers, students, and engaged community members with accessible resources to learn, teach, and advocate for justice in their own communities.

12. Together, these programs carry my father's legacy forward by connecting history to the present, equipping people with the knowledge and resources to engage in civic life, and empowering them to stand up for civil liberties, social justice, and the rights of all Americans.

13. The materials at the National Archives at San Francisco (alternatively, San Bruno Archives) are invaluable to both my effort to understand my family history (even before WWII), and the work of the Fred T. Korematsu Institute.

14. For example, the Archives contain immigration records for my grandparents, who both came through Angel Island. There are also records showing that my grandfather was able to purchase land before the Alien Land Act of 1913, which prohibited Asian immigrants from owning agricultural land. Families and descendants rely on this type of records to piece together their ancestors' stories and to locate family property.

15. The National Archives at San Francisco holds an immigration arrival investigation case file for my grandmother, Kotsui Korematsu (née Aoki), who arrived at Angel Island on January 12, 1914, aboard the ship, *Siberia*. She was 22 years old and had come from Japan as a picture bride. Her file is part of Record Group 85, Records of the Immigration and Naturalization Service. This record connects my family's history to the broader history of Japanese immigration to California in the early twentieth century. It helps me see my grandmother not simply as an ancestor whose name has been passed down through my family, but as an individual whose

arrival the federal government documented. For descendants of immigrants, records like hers can provide a rare and tangible connection to relatives whose experiences might otherwise remain largely unknown.

16. At the National Archives in Washington, D.C., including its downtown and College Park facilities, we recently located records in Record Group 210 that provide new leads in reconstructing my father's movements after his arrest in 1942. Documents dated June 18, July 1, and September 8, 1942, identify Company B, 524th Military Police Battalion in connection with his transfer from the Presidio in San Francisco to the Tanforan Assembly Center in San Bruno, California. We are continuing to investigate where my father was held at the Presidio or Fort Winfield Scott before that transfer, including whether military-police, guardhouse, stockade, or prisoner records from that period survive. Although these records have helped establish parts of his timeline, the precise location where he was held remains unknown. This research has reinforced for me that archival records can help reconstruct individual experiences and answer historical questions that might otherwise remain unresolved.

17. Although I have not yet completed my research at the National Archives at San Francisco, I consider it an essential next step in understanding my father's experiences and completing this account of my family's history. The National Archives at San Francisco's catalog identifies federal court records relating to his prosecution, including *United States v. Fred Toyosaburo Korematsu,* No. 27635, in Record Group 21, and *Fred Toyosaburo Korematsu v. United States*, No. 10248, in Record Group 276. The catalog descriptions identify criminal case files, appellate briefs, a judgment dated September 8, 1942, and exhibits that include my father's handwritten statements, his Selective Service card under the name "Clyde Sarah," and his altered birth certificate. Although I have not yet examined these materials in person, their descriptions indicate that they may provide important evidence for my ongoing research into his arrest, prosecution, and legal challenges. I intend to investigate these records alongside the materials already located in Washington, D.C., to develop a more complete account of my father's experiences and the government actions that shaped his life.

18. For the documentary film, "Of Civil Wrongs & Rights: The Fred Korematsu Story," Director Eric Paul Fournier sent an archivist to the San Bruno National Archives to do research for the film that received two Emmys in 2002.

19. These records are not digitally available. The only way to access these records is by physically going to the San Bruno facility to research them in person. Transferring these records out of the Bay Area, let alone out of state, makes it significantly more expensive and logistically difficult for the Korematsu Institute -- based in the Presidio in San Francisco -- to continue its important work.

20. Finally, the San Bruno Archives were indispensable to my work in advising California on developing a curriculum for high school ethnic studies under a recently passed law that mandates ethnic studies classes for high school graduation. I directed curriculum writers to go to the San Bruno Archives to do the research and this work is ongoing. In addition, the Archives contain documentation of not just Asian American communities but many other ethnic communities in California. I continue to direct researchers to go to the San Bruno Archives to conduct the research to expand the ethnic studies curriculum and work to develop recommendations that can be submitted to the California Department of Education as part of my role as one of the State's Education Ambassadors. We also encourage young people to go to the San Bruno National Archives to do research on their own families.

21. Closing the San Bruno Archives will cause significant harm to my work and the work of the Fred T. Korematsu Institute. I have started writing a book about my family's history, and research at the National Archives at San Francisco is a critical remaining step in that project. The records I have already located in Washington, D.C., have raised new questions about my father's movements after his arrest, and the federal court records identified in the San Bruno Archives' catalog offer another avenue for investigating his prosecution and its aftermath. I need the opportunity to consult these materials in person, determine what additional evidence they contain, and connect them with the records I have already examined. If the San Bruno Archives close before I can complete this research, I may lose practical access to records that are essential to finishing the book.

22. The significance of these collections extends beyond my own family. The San Bruno holdings include records relating to *Korematsu v. U.S.* and the broader history of Japanese American incarceration. The San Bruno Archives' catalog also identifies records relating to Mitsuye Endo's habeas corpus case, *In the Matter of the Application of Mitsuye Endo for a Writ of Habeas Corpus*, and her appeal, *Endo v. Eisenhower*. Endo's case and my father's case reached the United States Supreme Court during the same period, and both decisions were issued on December 18, 1944. However, they addressed different legal questions arising from the government's wartime policies. My father challenged his conviction for remaining in an area from which people of Japanese ancestry had been ordered excluded. Endo challenged her continued detention by the government, which the Supreme Court ruled could not be justified when the government conceded that she was a loyal and law-abiding citizen. The Court upheld my father's conviction in *Korematsu v. United States*, while unanimously ruling in *Ex parte Endo* that the government lacked authority to continue detaining Endo under those circumstances. These cases reveal different dimensions of the government's treatment of Japanese Americans during World War II and the legal challenges to that treatment. Examining the underlying records of both cases can help researchers better understand how the government implemented its wartime policies, how Japanese Americans challenged those policies, and how the courts responded to those challenges. Preserving access to these records is important not only to understanding my father's experience, but also to documenting this broader history and its continuing significance for civil liberties.

23. Whenever I recently visited the Archives in Washington, DC, I was struck by how delicate and fragile many of the historical records are. That serves as a reminder of the ease with which history could be forgotten and erased. The records at the San Bruno Archives include my grandmother Kotsui Korematsu's immigration arrival investigation case file, documenting her arrival aboard the *Siberia* on January 12, 1914, as well as federal court records relating to my father's arrest, prosecution, and subsequent legal proceedings. These materials preserve evidence of my family's experiences and help connect our personal history to the broader history of Japanese American immigration, wartime exclusion, and incarceration.

24. Although digitization can make historical materials available to a wider audience, a digital copy cannot always replace access to the original document. Not every record is digitized, and researchers may need to examine original documents and related materials to investigate questions that cannot be answered by a catalog description alone. Preserving the original records and maintaining meaningful access to them are both important to ensuring that history is not forgotten or erased. Moving the materials from San Bruno and scattering them around the country, away from the communities whose history they document, would greatly hinder those communities' quest to understand their past. Many of those communities, like the Japanese American community and the Native tribes, have suffered long periods of marginalization and oppression. Their history deserves respect. Keeping these records accessible helps families, researchers, and community organizations continue to uncover and preserve histories that might otherwise remain incomplete or overlooked.

25. The closure of the San Bruno Archives would also be a huge disservice to educators and local students studying Japanese American history, World War II incarceration, immigration, civil rights, and California history, as having easy access to the physical records and artifacts has played an important role in making history tangible for young people, and in motivating the new generation to understand and preserve the unique stories of their communities.

26. For example, the immigration file documenting my grandmother's arrival in 1914 and the federal court records relating to my father's prosecution offer concrete ways for students to explore how government policies affected individual people and families. These primary sources can help students look beyond textbook summaries and examine the documentary evidence of immigration, racial discrimination, wartime exclusion, and the struggle for constitutional rights. They can also encourage students to investigate their own family histories and learn how the experiences of their communities fit into the broader history of the United States.

27. The National Archives at San Francisco holds records created by federal courts and more than 100 federal agency field offices, documenting communities across northern and

central California, Nevada, Hawaii, and U.S. territories in the Pacific. Maintaining local access to these collections helps educators, students, researchers, and families continue this work. Moving records farther from the communities and educational institutions that rely on them could increase the time, expense, and logistical challenges involved in accessing them. Preserving access to the San Bruno Archives would help ensure that future generations can continue to learn from the historical records of their communities and understand the experiences that have shaped them.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 27th day of October, 2026, in San Francisco, California.

Karen Korematsu