ROB BONTA
Attorney General of California
LARA HADDAD
R. MATTHEW WISE
Supervising Deputy Attorneys General
NANDING CHEN (SBN 348808)
JOE MEEKER (SBN 335725)
S. CLINTON WOODS (SBN 246054)
CAROLYN DOWNS (SBN 353455)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6720
Fax: (916) 731-2124
E-mail: Carolyn.Downs@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br><br>Plaintiff,<br><br>**v.**<br><br>**UNITED STATES NATIONAL ARCHIVES AND RECORDS ADMINISTRATION; BRADFORD WILSON,** in his official capacity as Archivist of the United States,<br><br>Defendants. | Case No. 5:26-cv-11868-NW<br><br>**DECLARATION OF ASSISTANT PROFESSOR ANDREW LEONG IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Andrew Way Leong, declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I am an Assistant Professor of English at the University of California at Berkeley, where I have taught since 2018. My academic research and teaching focuses on the literature of Japanese diasporas in the Americas and the recovery and translation of Asian American literature

originally written in languages other than English. Much of my work involves recovering and translating original materials, such as the records and archives housed at the San Bruno National Archives Facility.

3. Prior to joining the faculty at Berkeley, I was an assistant professor of English and Asian Languages and Cultures at Northwestern University. I received my Ph.D. in Comparative Literature (English, Japanese, Spanish) from UC Berkeley in 2012, and completed my B.A. in Comparative Literature (English, Spanish, Mathematics) at Dartmouth College in 2003.

4. The San Bruno National Archives house a unique collection of materials that hold special significance for Northern California residents, and researchers like me. For example, certain original records from Angel Island immigration, records pertaining to the Chinese Exclusion Act, and the internment of Japanese Americans during World War II are housed at the San Bruno National Archives Facility. A large percentage of these materials are only available to be viewed in person, as they have not been digitized. Many other materials are fragile and/or practically impossible to scan or digitize. As a result, me and my students make frequent trips to the San Bruno National Archives Facility as part of our work.

5. Materials housed in the San Bruno National Archives are indispensable/invaluable for the work of me and my students. Oftentimes the only way to complete the type of research and translation my students and I need to do is to physically go to the San Bruno National Archives Facility. For example, for an ongoing research project to produce critical translations of Japanese-language literary journals produced at the Tule Lake Segregation Center, the production of historically-informed translations and authorial biographies requires extensive consultation of Alien Files ("A-Files") housed at the San Bruno National Archives. During a typical semester, I estimate that this work requires that my students and I make 8-10 trips to the San Bruno National Archives Facility.

6. Closing the San Bruno Archives will cause significant harms to my work and the work of my students. As previously mentioned, many of the records my work requires to review are not available online in any capacity. Some records are too old and fragile to be digitized. For example, hand- and typewritten records produced during the paper-rationing of World War II

often used thinner and more fragile paper stocks from lower-grade pulp. Other records are too voluminous to be digitized or photocopied practically and thus the only way to complete the research is to access the physical document. For example, one literary journal at Tule Lake, *Tessaku,* had contributions from approximately 150 authors, of which roughly a third (50) have A-files. A typical A-file is approximately 200 pages long and collates documents, notes, and affidavits from multiple agencies and individuals. The contents are thus of irregular size and shape; they make use of widely varying forms of document-fastening that require individual, manual handling. All of these factors make bulk digitization impractical.

7. Simply relocating those records to Kansas City or another National Archives facility would cause great hardship on my research, and would likely end several areas of inquiry. While it is very easy for me and my students to get on a BART train to go to the San Bruno National Archives Facility for one day, it would be orders of magnitude more difficult and expensive to travel to another facility, likely requiring the University to pay for flights and lodging to complete the research. Depending on where the records are moved, it may be cost-prohibitive to continue this area of research. Moreover, if the records are not moved to the same location, it may take trips to several locations.

8. Moreover, the type of work we do is often aided by going to the San Bruno National Archives Facility for the day and then spending the next several days going over the results of our research back on campus. This time back on campus allows us to digest our findings and determine what would should be our next area of inquiry at the National Archives. This time to digest would not be possible if the records were moved from the San Bruno National Archives Facility because it would be cost prohibitive to fly back and forth after just one day. Rather, we would have to plan to spend several days or even weeks traveling to view the records at the remote facility, decreasing the efficiency of our research.

9. Moreover, the archivists employed at the San Bruno National Archives Facility are specifically trained to be familiar with these types of records, how to locate them, and how to handle them. For example, immigration and internment records often contain irregular or archaic romanizations of East Asian surnames, and local staff with the linguistic proficiencies required to

meaningfully parse and assist with record searches and requests are essential. The loss of the institutional knowledge of those archivists would greatly slow down the efficiency of our research.

10. Many of these records are extremely fragile and delicate. Moving them, even if the move is planned and deliberate, risks damaging or destroying the records. For example, handwritten letters and testimonials from the late-nineteenth century, records written or printed on low-quality paper during World War II, and graphite pencil annotations are highly sensitive to vibration and movement.

11. If the San Bruno National Archives Facility is closed, faculty and students from U.C. Berkeley and the rest of Northern California will lose convenient access to a rich set of resources, which will impede research and teaching.

12. The threatened closure of the San Bruno National Archives Facility has already begun negatively affecting my work. There are only eight research desks at the San Bruno National Archives Facility, which must be reserved in advance. Ordinarily, it is easy to reserve research desks. But since the announced closure, the reservations are completely booked out and none are available until late November. This is already hindering my students' ability to complete their research.

13. I am aware of dozens of other faculty at Berkeley and other Bay Area universities that also use the San Bruno National Archives Facility in very similar ways to complete their academic work. Those university faculty and their students would also be negatively affected by the planned closure.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 9 th day of October, 2026, in Berkeley, California.